Filed 1/21/26  P. v. Freeman CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KAYLAN CHARLES FREEMAN,<br><br>    Defendant and Appellant. | A169624<br><br>(San Mateo County<br>Super. Ct. No. 21SF001757A) |

For a three-year period between 2012 and 2014, when he was 22 to 25 years old, Kaylan Charles Freeman kidnapped, raped, and forced teenage girls to orally copulate him.  His victims ranged in age from 13 to 18 years old.  Although Freeman testified each sex act was consensual, a jury convicted him of 20 felony counts including rape, forcible oral copulation, kidnapping to commit child molestation, and lewd and lascivious acts, and found true multiple aggravating circumstances.  On appeal, Freeman raises numerous challenges to his convictions, which can be distilled into three categories: (1) insufficient evidence as to two counts of conviction; (2) instructional error; and (3) sentencing error.  We remand for the limited purpose of calculation and imposition of the requisite custody credits.  In all other respects, we affirm.

1

# BACKGROUND

## A.  *Charges*

On July 31, 2023, the San Mateo County District Attorney charged Freeman in a second amended information with 20 felony sex offenses against five victims: J (count 1); M (counts 2–14); P (counts 15–16); T (counts 17–18); and D (counts 19–20).[1]

---

[1] The specific counts were alleged as follows: count 1 (J)—forcible rape of child victim over 14 (Pen. Code, § 261, subd. (a)(2) (further undesignated statutory references are to the Penal Code)); count 2 (M)—kidnapping to commit lewd acts (§ 207, subd. (b)); count 3 (M)—forcible rape of child under 14 (§ 261, subd. (a)(2)); count 4 (M)—forcible lewd act on child (§ 288, subd. (b)(1)); count 5 (M)—kidnapping (§ 209, subd. (b)(1)); count 6 and 7 (M)—forcible oral copulation of child over 14 (§ 288a, subd. (c)(2)(C), renumbered effective January 1, 2019 as § 287, subd. (c)(2)(C) (Sen. Bill No. 1494 (2017-2018 Reg. Sess.), Stats. 2018, ch. 423, § 49); counts 8, 9, and 10 (M)—forcible rape of child over 14 (§ 261, subd. (a)(2)); counts 11, 12, and 13 (M)—forcible oral copulation of child over 14 (§ 288a, subd. (c)(2)(C)); counts 11, 12, and 13 (M)—forcible rape of child over 14 (§ 261, subd. (a)(2)); count 15 (P)—forcible rape of child over 14 (§ 261, subd. (a)(2)); count 16 (P)—rape by use of drugs of child over 14 (§ 261, subd. (a)(3)); count 17 and 18 (T)—forcible rape (§ 261, subd. (a)(2)); count 19 (D)—forcible rape of child over 14 (§ 261, subd. (a)(2)); count 20 (T)—forcible oral copulation of child over 14 (§ 288a, subd. (c)(2)(C)).

The following enhancements were alleged: count 1 (J)—multiple victims and victim over 14 (§ 667.61, subds. (b), (e) & (m)); count 2 (M)—10-year limitation (§ 801.1, subd. (b)); count 3 (M)—multiple victims, tying or binding, and victim under 14 (§ 667.61, subds.(b), (e), (j)(1), & (j)(2)); count 4 (M)—multiple victims, tying or binding, and victim under 14 (§ 667.61, subds. (b), (e), (j)(1), & (j)(2)); count 5 (M)—offenses committed in more than one jurisdiction (§ 784.7, subd.(a)); count 6 (M)—multiple victims, tying or binding, kidnapping, and child victim over 14 (§ 667.61, subds. (b), (e), (*l*), & (m)); count 7 (M)—multiple victims, tying or binding, kidnapping, and child victim over 14 (§ 667.61, subds. (b), (e), (*l*), & (m)); count 8 (M)—multiple victims, tying or binding, kidnapping, and child victim over 14 (§ 667.61, subds. (b), (e), (*l*), & (m)); count 9 (M)—multiple victims, tying or binding, kidnapping, and child victim over 14 (§ 667.61, subds. (b), (e), (*l*), & (m)); count 10 (M)—multiple victims, tying or binding, kidnapping, and child

**B.** *Evidence at Trial*

Trial took place over approximately nine court days in 2023. We describe the testimony relevant to the issues on appeal.

**Prosecution Case**

Victim J (Count 1)

J knew Freeman since she was eight years old; he had been a friend of her neighbor's brother. In 2011, when she was 14 or 15, J and Freeman hung out with the same group of people. Once when she was at the home of her sister's boyfriend, Freeman came up behind her in the bathroom and pushed his body into her. On another occasion in 2012, sometime after her 16th birthday, Freeman asked J if she wanted to take his dog for a walk and she agreed. As they walked, Freeman stopped at a bench, where he "guided" J down and pulled her pants off. She told him to stop and tried to push him off, but he pulled off her underwear and raped her. When a woman walked by, J pushed him off. About a year later, Freeman did the "same thing [to J] that happened at the bench"; J again told him to stop, but he ignored her.

Victim M (Counts 2 -14)

M first met Freeman in October 2013 when he reached out to her on Instagram. She was a freshman in high school. They had acquaintances in

---

victim over 14 (§ 667.61, subds (b), (e), (*l*), & (m)); count 11 (M)—multiple victims and child victim over 14 (§ 667.61, subds. (b), (e), & (m)); count 12 (M)— multiple victims and child victim over 14 (§ 667.61, subds. (b), (e), & (m)); count 13 (M)—multiple victims and child victim over 14 (§ 667.61, subds. (b), (e), & (m)); count 14 (M)—multiple victims and child victim over 14 (§ 667.61, subds. (b), (e), & (m)); count 15 (P)—multiple victims, tying or binding, and child victim over 14 (§ 667.61, subds (b), (e), (*l*), & (m)); count 17 (T)—multiple victims (§ 667.61, subds. (b) & (e)); count 18 (T)—multiple victims (§ 667.61, subds. (b) & (e)); count 19 (D)—multiple victims and child victim over 14 (§ 667.61, subds. (b), (e), & (m)); and count 20 (D)—multiple and child victim over 14 (§ 667.61, subds. (b), (e), & (m)).

common who were older than M. Although she was then 13 years old and just one month shy of turning 14, M told Freeman she was 14 because she "thought it made it better." Freeman told her he was 23 or 24. Through messages M told Freeman about her hostile and abusive home life; she often stayed away from home, sometimes living in a car.

M agreed to meet Freeman to smoke marijuana, and he picked her up in his car. Freeman's dog was in the car. As they smoked, Freeman drove to a remote windy area with no cell service.

After stopping at a turnout point, Freeman tried to touch M; she was not interested but "didn't want to be rude," so she acted as if she were "really shy." She tried moving away from him; she also believed she said " 'no.' " Undeterred, Freeman pulled M into the backseat by the hood of her jacket. While in the backseat, he began removing M's clothes from the waist down. M "was still saying no and . . . trying to . . . keep his hands off" her, "but it wasn't working." She was "trying to move away from where his hands were," but that did not deter him. She tried to close her legs, but he pushed them open with his hands. After she tried to hit him, he said, " 'Don't ever fucking hit me' "; he then zip tied her hands to the car. Scared by Freeman, M stopped fighting. She closed her eyes and covered her face with her arms while he penetrated her vagina with his penis. Afterward, he removed the zip ties with scissors. The evidence described in this paragraph summarizes the incident that is the basis for the charges in counts 2 (§ 207, subd. (b) [kidnapping]), 3 (§ 261, subd. (a)(2) [rape of a child under 14 years]), and 4 (§ 288, subd. (b)(1) [forcible lewd act upon a child]), discussed below.

A couple months later, M contacted Freeman via an instant messaging app and told him what he did to her was " ' fucked up.' " He apologized and said he wanted to make it up to her. Thereafter, she met him between six

4

and 10 times. Sometimes, she initiated the contact because she wanted to be friends and to see him even though he had sexually assaulted her. M explained she "just wanted somebody to care." M told Freeman she was suicidal and had been cutting herself. She also told him that sometimes she lived in a car.

One time in June 2014, Freeman picked M up at or near where she had been living. He demeaned her for piercings and scars on her arms, called her "white trash," and pulled off her false eyelashes. They drove through the neighborhood and smoked marijuana. She went into the backseat and drank some liquor until she became "buzzed." Once Freeman stopped the car, he set his cell phone to video record and physically forced M to perform oral sex on him. She pushed him, said she did not want to do it, and tried to knock the phone over so he could not make a video.

On a different occasion, Freeman picked up M and she smoked a couple of "blunts" of marijuana and was really inebriated. He gave her a white powder he said was cocaine, however, unlike her past experience with cocaine, the powder made her feel tired and sleepy. He forced her to perform oral sex by putting his penis in her mouth.

On another occasion when she was 14, Freeman "forced [M] to perform oral sex or he wouldn't take [her] home." On cross examination, M said that "it wasn't, like, physically forced," but she worried that if she did not do it he would kick her out of the car and not bring her home. M said she deliberately did a poor job performing oral sex. Freeman told M he would take her home and buy her things if she "d[id] it better." Eventually, Freeman took her home.

At a different time, when she was 14 or 15, Freeman picked her up and blindfolded her saying, "It's a surprise," and they were going to an apartment

5

in San Francisco.  (This incident formed the basis of the charges in count 5, discussed below.)  She was afraid she would "not [be] coming home."  M described feeling "frozen," "paralyzed," and "really, really scared."  M "wanted to jump out" of the car, but she knew it was not safe and there was no one who could "come save . . . or help" her.

When she tried to remove the blindfold, Freeman "just readjusted it.  And [M] just got really scared again" and stopped trying to remove it.  He removed the blindfold when they got to a tall skinny apartment on a hill.  Inside there were a lot of men watching TV.  Freeman took M upstairs to a room with a bed.  Freeman told M she could use the shower.

As M was laying down on the bed, smoking a "blunt," Freeman asked if he could do different things to her, such as masturbate over her body; she said no.  Freeman got on top of her and penetrated her vagina with his penis.  She said no and tried to push him off.  She remembers screaming loudly, hoping someone would come help her but no one did.  Afterward, M told Freeman he had " 'just raped' " her; he responded by saying, " 'Don't say that.' "  He penetrated her vagina with his penis three or four more times.  Freeman told her he would not take her home unless she performed oral sex.  Freeman eventually took M home after she did.

On another occasion when M was 15, Freeman asked her to talk in his parked car in an alley near her house.  Freeman suggested they take a nap; there were pillows and blankets in the back.  In the back, Freeman started to undress her.  She tried to keep her legs together, but he lifted her legs and penetrated her vagina with his penis.  She just wanted to get it over with so she could go to sleep.

M told many people about what Freeman had been doing to her: two therapists, a probation officer, multiple police officers, and her mother.  She

6

told a counselor that Freeman, who she described as her boyfriend, had been raping her for four to six months. When speaking with an investigator from child protective services, M confirmed that she told her therapist about the rapes. Eventually M spoke to the police. She became frustrated because the police asked her the same questions day after day for a couple of weeks. M testified that the police told her she "was being uncooperative with the investigation and they weren't going to pursue it any longer."

Victim P (Counts 15 & 16)

In spring 2014, when P was 17 and a junior in high school, she met Freeman through her friend, Victim M (counts 2-14), who was a couple grades below her. P was aware that M had been seeing Freeman and had "been with him." Based on what M told her, P believed that Freeman was M's boyfriend.

Freeman started contacting P by phone. He invited P to go to a restaurant with him. P invited her friend T, who was a senior and helped P with school.[2] She wanted T to meet Freeman because she thought he was a "nice guy." P introduced Freeman to her mother, who told her that Freeman was "too old for her." But P's mother did not think too much about the meeting because P told her she and Freeman were just friends.

At one point, however, P told her mother that she and Freeman were going out to dinner. Around that same time, P's mother said she "started getting more information from the school officials telling me that this guy was creeping around . . . the school, trying to hit on younger girls."

On one occasion, Freeman offered marijuana to P. P believed it was laced with something because she started feeling dizzy, disoriented and

---

[2] Soon to be Victim T, as discussed below.

sleepy. She told Freeman she needed to sit down or be driven home, but Freeman refused to drive her home and told her to get into the car. She got into the back seat and he got in with her. She did not recall much other than that her hands were tied behind her with the seat belt and that her head was hitting the door as he penetrated her vagina with his penis. She woke in the morning and put on her clothes. She did not know what happened. She did not call the police or tell anyone about what had happened.

Victim T (Counts17 & 18)

T was an 18-year-old high school senior in March 2014. As described above, T was friends with Victim P, (counts 15-16). and T had agreed to have dinner with P so she could meet Freeman, P's new boyfriend. The dinner was set for March 18, 2014.

During the three days before the dinner, Freeman texted T about the plans. T felt like Freeman was "coming on to her" and she mentioned it to P. Freeman showed up to the meeting point alone and said P was waiting at the restaurant. T and Freeman smoked marijuana on the way to the restaurant, and then had dinner. P was not there and did not respond to T's texts. Freeman drank alcohol, but T did not. After they finished eating, T said she wanted to go home. Although Freeman said he would take T home, he drove in the opposite direction. When T realized Freeman was not taking her home, she became scared and thought "[s]omething bad" was going to happen. She wanted to get away, but could not think of a way out. T was about 5 feet 5 inches tall and 130 pounds; she described Freeman as "a big guy" with a "stocky" build, about six feet tall and 200 pounds.

After driving around for about 20 minutes, Freeman parked the car and became "frisky" with T and started removing her clothes. T told Freeman no. Freeman picked up T and threw her into the back seat. T tried to push

8

Freeman's face away as he repeatedly tried to kiss her. Freeman grabbed T's wrists and put them above her head and removed T's clothes; as T struggled, Freeman raped her.

T suspected that the marijuana Freeman gave her had been "laced" because it felt different than marijuana she had smoked before. T's brain felt "fogged" and "clouded." Freeman assaulted T first in the "missionary position" and then "pulled out," moved T, and assaulted her "doggy style." It felt "like an eternity," although T was unsure how long the assaults lasted. T told Freeman to stop, but she was unable to physically defend herself. Freeman ejaculated on T's back and wiped it off with his shirt. He handed T her clothing, except for her underpants which he told her he was keeping. Freeman eventually drove T home.

Victim D (Counts 19 & 20)

D knew Freeman when she was growing up. Around October or November 2012, when she was 17 and a junior in high school, D saw Freeman at a friend's house, where a group of people were playing games. Freeman told D to come upstairs because he had drugs for her, and she followed him to a bedroom. D tried to leave but Freeman blocked the door with his body; Freeman grabbed her by the arm, and pushed her onto the bed. She was intoxicated and had a hard time getting back up. Freeman took off D's pants and told her to get on her knees. D was intoxicated and afraid, so she positioned herself as directed. Freeman then started to perform oral sex on D, "licking [her] genitals." D asked Freeman to stop but he did not listen; D testified she did not want him to perform oral sex on her. At one point, Freeman had his hand around D's neck. Freeman later put his penis in D's vagina. After the assault, D wanted to leave but Freeman restrained her on the bed for about five minutes. D did not consent to having

9

sex of any kind with Freeman. A few days after the rape, Freeman texted D that he felt bad about the way he treated her and wanted to make it up to her. She did not report the rape because she was embarrassed since she felt like it was her fault for flirting with Freeman.

**Defense Case**

Freeman, born in October 1990, admitted he engaged in sexual activity with each of the five teenagers but denied he ever used force. He testified he "live[d] by" the "guideline" that "no means no," when it came to sexual consent.

Freeman met victim M on a dating website which requires participants to be 18 or older. When M told Freeman she was a freshman, he thought she meant in college. He saw M over the course of a year, and they had sexual relations several times, but M never told him which college she attended. Freeman never saw M drive; one time, he picked her up from the local high school. Freeman had "no idea" why high school authorities warned parents about him "creeping around."

The last time he talked with M—years after they met—M "confessed her age," and Freeman, describing himself as "morally shocked," said, "that is not very all right or cool" and stopped seeing her.

When he was younger, Freeman wanted to "hook up with a lot of girls," as his friends were "sleazes or manwhores." Freeman "always tr[ied] to respect women." If a woman was even slightly intoxicated, Freeman claimed he would not touch her, even to shake hands. Freeman said he did not usually use profanity when talking to his mother. He denied calling the victims " 'bitch ass kids' " or accusing them of " 'squawking about shit.' "

**People's Rebuttal**

The prosecution impeached Freeman with recorded jail phone calls he made when he was in pretrial custody. During a recorded jail call with his mother, Freeman stated, "I could understand when I was stupid and down and I would do anything for a fucking kick, dude. But I've been on the straight and narrow for a long fucking time, dude." Freeman frequently said "fuck" when talking to his mother on these recorded phone calls.

During recorded jail calls, Freeman told his mother he "was fucked up" and wanted to "do something . . . player-like," and he referred to the victims as "bitch ass kids" and "fucking little girls squawking about shit." During another call, Freeman told a friend, "I did have sex with them. I fucking went through every single one of them, dude."

## C.    *Verdicts and Sentencing*

The jury found Freeman guilty as charged on all 20 counts. As to the enhancement allegations, the jury found all but seven of them true.[3]

---

[3] The jury verdict on the enhancements was as follows: As to count 1 (victim J), the jury found true the allegation of multiple victims (§ 667.61, subds. (b). (e) & (m)). As to count 2, the complaint was filed within 10 years of the specified sex offenses (§ 801.1, subd. (b)). As to count 3, the jury found true the allegations of tying or binding (§ 667.61, subds. (b) & (e)); the allegations of multiple victims and child under 14 were not true (§ 667.61, subd. (j)). As to count 4, the jury found true the allegation of tying or binding and child victim under 14 (§ 667.61, subds. (b), (e), & (j)(2)); the allegation of multiple victims was not true (§ 667.61, subds. (b), (e) & (j)(1)). As to counts 6 through 10, the jury found true the allegations of kidnapping and multiple victims (667.61, subds. (b), (e), (*l*) & (m)); the allegation of tying or binding was not true. As to counts 11 through 14, the jury found true the allegations of multiple victims and child victim over 14 (§ 667.61, subds. (b), (e), & (m)). As to count 15, the jury found true the allegations of multiple victims and tying or binding (§ 667.61, subds. (b), (e), (*l*), & (m)). As to counts 17 and 18, the jury found true the allegation of multiple victims (§ 667.61, subds. (b) &

11

The court sentenced Freeman to six terms of life without the possibility of parole (counts 6, 7, 8, 9, 10, and 15), one parole eligible life sentence (count 5) stayed pursuant to section 654, consecutive to an indeterminate term of 245-years-to-life (15 years to life on counts 3, 17, 18, and 25-years to life on counts 1, 4, 11, 12, 13, 14, 19, and 20. The court imposed the upper terms for counts 2 (11 years) and 16 (8 years); the sentence as to counts 2 and 16 was stayed pursuant to section 654.

## DISCUSSION

### I.

### Sufficiency of the Evidence

**A.** *Sufficiency of the Evidence to Prove Kidnapping For Child Molestation (Count 2, Victim M)*

Kidnapping for child molestation, a type of kidnapping in violation of section 207, is defined as follows: "Every person, who for the purpose of committing any act defined in Section 288 [lewd or lascivious conduct], hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any child under the age of 14 years to go out of this country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (b).)

Lewd or lascivious conduct set forth in subdivision (a) of section 288, is described by statute as "willfully and lewdly commit[ing] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ."

---

(e)). As to counts 19 and 20, the jury found true the allegations of multiple victims (§ 667.61, subds. (b), (e), & (m)).

12

Freeman argues the evidence was insufficient to prove kidnapping with the intent to commit lewd or lascivious acts on victim M as charged in count 2 (§ 207, subd. (b)) because he "lacked the specific intent necessary to commit this crime" on account of being "misled to believe that M was over 14."[4]  This challenge fails as a matter of law.[5]

It has long been the rule that a good faith, reasonable mistake as to a victim's age is not a defense to a charge under section 288, subdivision (a). (*People v. Olsen* (1984) 36 Cal.3d 638, 648–649 (*Olsen*); *People v. Magpuso* (1994) 23 Cal.App.4th 112, 113–114.)  Freeman acknowledges this in his opening brief, conceding that "as a matter of public policy, the mistake of fact defense does not apply to the commission of a lewd act on a child under the age of 14," and citing *Olsen*.  However, relying on *People v. Hanna* (2013) 218 Cal.App.4th 455 (*Hanna*), he takes the position that because the mistake of fact defense applies to "attempts to commit that crime," it must also apply to kidnapping under section 207, and thus that his professed "belief that M was over 14 was a complete defense."

We find this argument without merit.  First, Freeman was not convicted of any *attempt* crime; he was charged with, and convicted of, kidnapping with the intent to commit a lewd act on a child under age 14. Second, Freeman has not cited any case involving kidnapping for child

---

[4] In its respondent's brief, the Attorney General mistakenly refers to this count as "count 1," but we understand the argument to be addressed to count 2.

[5] We do not reach Freeman's remarks made in passing in a footnote with regard to this count that it should be "noted" there was no evidence of forcible movement.  (See *Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 ["Footnotes are not the appropriate vehicle for stating contentions on appeal"].)

molestation where a court has acknowledged a mistake of fact defense relating to a victim's age. The cases Freeman cites for the proposition that the prosecution was required to show that he knew or should have known of M's age are inapposite because they do not address offenses that are illegal regardless of whether the victim is a minor. For example, *People v. Hernandez* (1964) 61 Cal.2d 529, 535–536, held that reasonable mistake of age is a defense to the charge of unlawful sexual intercourse with a person under the age of 18. In that case, a defendant was convicted of statutory rape but not permitted to present evidence of his belief that the 17-year-old victim was 18 or older. In reversing the judgment, the court in *Hernandez* noted that " ' "[a]t common law an honest and reasonable belief in the existence of circumstances, which, if true, would make the act for which the person is indicated an *innocent* act, has always been held to be a good defense." ' " (*Id.* at p. 535, italics added.) In such a case, the mistake of fact defense was available because "had the defendant's mistaken view of the facts been correct, it would have precluded a finding of criminal intent or evil design and the defendant's conduct by itself would have been entirely innocent." (*People v. Parker* (1985) 175 Cal.App.3d 818, 822.) Here, on the other hand, Freeman's acts of kidnapping, sexually assaulting, and raping M would be culpable regardless of her age.[6] (See, e.g. *People v. Scott* (2000) 83

---

[6] For the same reason, Freeman's reliance on *Staples v. United States* (1994) 511 U.S. 600 is unpersuasive. There, the United States Supreme Court held the government was required to prove beyond a reasonable doubt that the defendant knew the weapon he possessed had the characteristics of a statutorily prohibited machine gun. (*Id.* at p. 602.) The court explained that without proof of such knowledge, otherwise "entirely innocent" actions would be subject to criminal sanctions. (*Id.* at pp. 614–615.) Here, unlike the *Staples* defendant, Freeman's acts of kidnapping, sexually assaulting, and raping M would be criminal regardless of his knowledge about her age.

14

Cal.App.4th 784, 800 [defense not available where, "even if [the victim] had been 16, [defendant] would still be guilty of felony unlawful sexual intercourse"]; *People v. Magpuso, supra*, 23 Cal.App.4th at p. 118 [defense unavailable where defendant "was committing a criminal act, with criminal intent *regardless* of her belief as to . . . age"].)

Accordingly, we conclude Freeman's challenge to the sufficiency of the evidence supporting his conviction in count 2 fails as a matter of law.

**B.** ***Sufficiency of the Evidence to Prove Kidnapping to Commit Another Crime (Count 5, Victim M) and Related Aggravated Kidnapping Circumstances (Counts 6, 7, 8, 9, 10, Victim M)***

Freeman next challenges the sufficiency of the evidence supporting: (1) count 5 (§ 209, subd. (b)(1))—kidnapping to commit another crime; and (2) the aggravated kidnapping circumstances alleged in counts 6 through 10 regarding the sexual offenses he committed against M in San Francisco (§ 667.61, subds. (b) & (e)).[7]  According to Freeman, reversal of these counts is required due to "[t]he absence of evidence of compelled movement."  We disagree.

### 1.   *Additional Background*

Freeman was charged with kidnapping M and driving her to San Francisco (§ 209, subd. (b)(1), count 5), where he raped her (§ 261, subd. (a)(2), counts 7, 8, 9, and 10) and forced her to orally copulate him (§ 288a, subd. (c)(2), count 6).  Accompanying aggravated kidnapping circumstances were alleged under the One Strike law (§ 667.61, subds. (b) and (e)) as to counts 6 through 10.  The jury convicted on all counts and found true the related aggravated kidnapping circumstances.

---

[7] In addressing this argument, the Attorney General apparently incorrectly refers to the evidence regarding the first meeting between Freeman and M.

2. *Applicable Law*

"[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

We begin with an overview of the law pertaining to asportation, the only element of kidnapping at issue here. In doing so, we focus on three statutes: section 207, subdivision (a), which establishes the crime of simple kidnapping; section 209, subdivision (b), which establishes the crime of kidnapping for robbery, rape, or other sex crimes (kidnapping for robbery or rape); and the One Strike law, under which Freeman was sentenced, which requires an increased term for convictions of certain sexual offenses if the defendant kidnapped the victim.

The legal standards as described by our Division One colleagues in *People v. Waqa* (2023) 92 Cal.App.5th 565 (*Waqa*), are instructive for our analysis here, and we quote them at length. "The asportation elements of these forms of kidnapping overlap, with the aggravated kidnapping circumstance requiring the greatest showing. Simple kidnapping, and thus the kidnapping circumstance, requires movement of a substantial distance. Kidnapping for robbery or rape requires that the movement increased the risk of harm to the victim. And the aggravated kidnapping circumstance requires that the movement *substantially* increased the risk of harm to the

16

victim.  In analyzing the sufficiency of the evidence here, we rely on authorities discussing all three of these different asportation elements.

"The One Strike law 'provides an alternative, more severe set of penalties for certain sex offenses committed under certain enumerated circumstances.' [Citation.] . . . The statute is designed 'to ensure serious sex offenders receive lengthy prison sentences upon their first conviction when their crimes are committed under circumstances elevating their victim's vulnerability.' " (*Waqa, supra*, 92 Cal.App.5th at pp. 576–577, fn. omitted.) Forcible rape and oral copulation, the crimes of which Freeman was convicted of in counts 6 through 10, are qualifying sexual offenses under the statute. (§ 667.61, subd. (c)(1).)

"The aggravated kidnapping circumstance requires that '[t]he defendant kidnapped the victim of the present [sexual] offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense.' (§ 667.61(d)(2) . . . .)  Similarly, kidnapping for rape or robbery requires a simple kidnapping in which the movement 'increase[d] the risk of harm to the victim over and above that necessarily present in . . . the intended underlying offense.' (§ 209, subd. (b)(1)–(2); see *People v. Rayford* (1994) 9 Cal.4th 1, 11–12.)" (*Waqa, supra*, 92 Cal.App.5th at pp. 577–578.)

"The asportation element of these three forms of kidnapping tied to the commission of another crime (simple kidnapping committed in conjunction with another offense; kidnapping for rape or robbery; and the aggravated kidnapping circumstance) requires that the movement be ' "more than that which is merely incidental to the commission or attempted commission of [the associated crime]." [Citations.]  '[I]ncidental movements are brief and insubstantial, and frequently consist of movement around the premises

17

where the incident began.  [Citations.]  By contrast, relatively short distances have been found not to be incidental where the movement results in a substantial change in "the context of the environment." ' " (*Waqa, supra*, 92 Cal.App.5th at p. 578.)

"Kidnapping for robbery or rape and the aggravated kidnapping circumstance also require that the movement increased the risk of harm to the victim beyond that inherent in the underlying offense, with the aggravated kidnapping circumstance further requiring that the increase was substantial.  (§§ 209, subd. (b)(2), 667.61, subd. (d)(2) . . . .)  '[T]he increased risk may be of either physical or psychological harm.'  [Citation.]  In contrast, for simple kidnapping an increase in the risk of harm to the victim is *relevant* to whether the victim was moved a substantial distance, but the crime does not require 'an increase in harm, or any other contextual factors.'  [Citations.]  Thus, compared to simple kidnapping, the 'essence' of both kidnapping for robbery or rape and the aggravated kidnapping circumstance 'is the increase in the risk of harm to the victim caused by the forced movement.'

"To summarize, the asportation element of the aggravated kidnapping circumstance requires proof that '(1) the movement was substantial in character, and not merely incidental to the commission of the sex crime [citation], and (2) "the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying" sex offense.'  These two prongs 'are not distinct, but interrelated, because a trier of fact cannot consider the significance of the victim's changed environment without also considering whether that change resulted in an increase in the risk of harm to the victim.' " (*Waqa, supra*, 92 Cal.App.5th at pp. 578–579, fn. omitted.)

As we now explain, there is sufficient evidence of both prongs.

### 3. *Analysis*

M's testimony provided substantial evidence that she was compelled, and did not volunteer to accompany Freeman to the San Francisco apartment (count 5) where she was repeatedly sexually assaulted (aggravating kidnapping circumstances alleged in counts 6 through 10). She described that she "got in the car, [she] was blindfolded with a piece of fabric and driven to San Francisco, to an apartment." She remembered feeling "frozen," "kind of paralyzed," and "really, really scared." M explained she was afraid of "[n]ot coming home." She testified her "whole body wanted to jump out of that car."

Freeman's argument on appeal is essentially that M voluntarily got into the car and thus there was no compelled movement and insufficient evidence to support aggravated kidnapping. Even if the evidence supported a conclusion that M voluntarily got into the car, that does not end the story. Freeman then drove her, blindfolded, to a distant apartment in San Francisco where she would be even more isolated and vulnerable than being sexually assaulted in a car. That no one responded to her screams during the rape in the San Francisco apartment underscores the increased danger of moving her to San Francisco. She was a young teenager, unfamiliar with San Francisco, with virtually no prospect of anyone coming to her aid. Also, after the rape, Freeman would not let her leave the bedroom unless she performed oral sex. What is more, Freeman increased the risk of psychological harm to M by blindfolding her once she got in the car and not allowing her to remove it. (*People v. Nguyen* (2000) 22 Cal.4th 872, 886 [increased risk of harm may be emotional or psychological].) The conviction in count 5 and the aggravated kidnapping circumstances alleged in counts 6 through 10 are supported by substantial evidence.

## II.

## Jury Instructions

### A.   *Mistake of Fact (Victim M, Count 2)*

Freeman did not request a jury instruction on mistake of fact in connection with count 2, the kidnapping for child molestation (§ 207, subd. (b)) charge involving M.  On appeal he contends the trial court erred by not giving this instruction sua sponte.[8]  We disagree.

"Generally, 'a mistake of fact defense is not available unless the mistake disproves an element of the offense.'  [Citation.]  Put another way, a mistake of fact instruction is only appropriate where the defendant's mistaken belief negates an element of the crime.  (*People v. Givan* (2015) 233 Cal.App.4th 335, 345.)  The trial court does not have a sua sponte duty to give a mistake of fact instruction.  The court is, however, required to give such an instruction on request, where a defendant presents substantial evidence on mistake of fact and the instruction is legally correct."  (*People v. Speck* (2022) 74 Cal.App.5th 784, 791.)

Freeman directs us to no authority for the proposition that mistake of fact as to the age of the victim is a "complete defense to a non-forcible kidnapping" in violation of section 207.  His reliance on *Hanna, supra,* 218

---

[8] The People argue Freeman forfeited this claim by failing to request the mistake of fact instruction in the trial court.  (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 874 & fn. 14 [no sua sponte duty to instruct on claim-of-right defense to robbery]; *People v. Anderson* (2011) 51 Cal.4th 989, 996–997 [no sua sponte duty to instruct on defense of accident to robbery because "*sua sponte* instructional duties" do not apply to an "attempt to negate or rebut the prosecution's proof of an element of the offense"].)  Because we conclude that an instruction on mistake of fact was not required in this case in any event, we do not reach this argument or Freeman's related ineffective assistance of counsel claim.

Cal.App.4th 455 is again misplaced. *Hanna* found the trial court erred when it denied defense counsel's request to instruct on mistake of fact as a defense to a charge of attempted lewd conduct with a child under the age of 14 years but that the error was not prejudicial. (*Id.* at pp. 460–463.) That case, unlike the present one, involved an *attempt* crime, which required the specific intent to commit a lewd act on a child under age 14. (*Id.* at p. 462.)

As discussed, the perpetrator's knowledge of the victim's age is not an element of kidnapping for child molestation. (§ 207, subd. (b).) Nor is "a good faith, reasonable mistake as to the victim's age" a defense to violation of section 288, commission of a lewd or lascivious act on a child under age 14. (*People v. Olsen, supra,* 36 Cal.3d at pp. 642, 647–649; see also *People v. Toliver* (1969) 270 Cal.App.2d 492, 494–496 [same]; *People v. Gutierrez* (1978) 80 Cal.App.3d 829, 833–836 [same].)

In sum, the trial court had no sua sponte duty to instruct on mistake of fact as to the count 2 offense of kidnapping for child molestation. (§ 207, subd. (b).)

**B.**  *Lesser Included Offenses*

Freeman contends counts 1, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 19, and 20 must be reversed because the trial court prejudicially erred in failing to instruct the jury on lesser included offenses. We disagree.

1.  *Applicable Law*

" 'A trial court has a sua sponte duty to "instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, *but not the greater*, offense.' " (*People v. Landry* (2016) 2 Cal.5th 52, 96.)

21

Courts have "applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the 'elements' test and the 'accusatory pleading' test. Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)

Our Supreme Court has repeatedly held that when applying the accusatory pleading test to determine whether one offense is necessarily included in another, courts do not look to evidence beyond the actual pleading and its allegations regarding the purported greater offense. (See, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1160 ["When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading' "], overruled on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; *People v. Smith* (2013) 57 Cal.4th 232, 244 [application of the accusatory pleading test "does not require or depend on an examination of the evidence adduced at trial"]; *People v. Montoya* (2004) 33 Cal.4th 1031, 1036 ["Consistent with the primary function of the accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense"].)

We independently review whether the trial court improperly failed to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

2. *Failure to Instruct on Unlawful Sexual Intercourse as a Lesser Included Offense to Charges of Forcible Rape of a Minor (Counts 1, 3, 7, 8, 9, 10, 14, 15, 19)*

Freeman requested the trial court to instruct the jury on unlawful sexual intercourse (§ 261.5) as a lesser included offense of each of the nine separate rape counts. The trial court denied the request for the instruction, ruling that unlawful sexual intercourse (sometimes referred to as statutory rape) was not a lesser included offense of rape.

Freeman argues that unlawful sexual intercourse (§ 261.5) is a lesser included offense of forcible rape (§ 261, subd. (a)(2)) under the accusatory pleading test.[9] Counts 1, 3, 7-10, 14-15, and 19 charged Freeman with forcible rape of a minor. Each count alleged "the victim was a child, 14 years of age and older," and each stated the birthdate of each victim.

The People argue unlawful sexual intercourse was not a lesser included offense to the charges of forcible rape under the accusatory pleading test because Freeman's age was not alleged in the information. The People cite *People v. Woods* (2015) 241 Cal.App.4th 461 (*Woods*) to support its position.

In *Woods*, the appellate court rejected an argument similar to the one Freeman raises, ruling unlawful sexual intercourse with a minor was not a lesser included offense of forcible rape under the accusatory pleading test. (*Woods*, *supra*, 241 Cal.App.4th at pp. 477–482.) In *Woods*, the information alleged, inter alia, numerous counts of "forcible rape" and numerous counts of "forcible oral copulation of a minor aged 14 or older." (*Id.* at p. 469.) It further alleged the defendant was subject to the One Strike law "in that he committed multiple offenses on separate occasions against the same victim,

_____

[9] Freeman concedes the elements test is not applicable to his argument.

who was a minor 14 years or older, pursuant to section 667.61, subdivisions (*l*) and (m)." (*Id.* at p. 470.)

The *Woods* court initially rejected the defendant's assertion that section 261.5, subdivision (a), in and of itself, describes a substantive offense. (*Woods, supra,* 241 Cal.App.4th at pp. 477–478.)  Rather, it "agree[d] with the People that subdivision (a) . . . acts in concert with the other subdivisions ([section 261.5,] subds. (b), (c), or (d)), to set out a substantive offense." (*Woods,* at p. 478.)  In this regard, the court pointed to the standard CALCRIM instructions for each of the three ways in which the offense can be committed.  "(See CALCRIM No. 1070 [instruction for unlawful sexual intercourse when defendant was 21 or older and victim was under 16 years old at the time of the intercourse, pursuant to § 261.5, subds. (a) & (d)]; CALCRIM No. 1071 [instruction for unlawful sexual intercourse when defendant is more than three years older than the victim and the victim was under the age of 18 at the time of the intercourse, pursuant to § 261.5, subds. (a) & (c)]; CALCRIM No. 1072 [instruction for unlawful sexual intercourse when defendant is not more than three years older or younger than the victim and the victim was under the age of 18 at the time of the intercourse, pursuant to § 261.5, subds. (a) & (b)].)" (*Woods,* at p. 478.)  In short, "[t]he three iterations of the offense of unlawful intercourse with a minor include not only the element of the victim's minority, but also require that the People prove the age of the perpetrator (either on its own or relative to the age of the victim) at the time of the intercourse." (*Id.* at p. 482, fn. 16.)

The defendant in *Woods* maintained the allegations of the forcible oral copulation charges, which included that " 'the victim was younger than 18 years old' " and " 'a minor' " at the time of the alleged acts, satisfied the accusatory pleading test for purposes of requiring a lesser included

24

instruction in connection with the forcible rape charge. (*Woods*, *supra*, 241 Cal.App.4th at p. 479.) The appellate court declined to look outside the forcible rape charges to find such an instructional duty, noting that the allegations of the forcible rape charges "did not allege Woods's age, or his age relative to [the victim's], with respect to the forcible rape counts." (*Id.* at p. 482, fn. 16.)

The defendant in *Woods* also pointed to the sentencing enhancement allegations, which alleged the victim was "a minor at the time of the intercourse," as satisfying the accusatory pleading test and triggering entitlement to a lesser included instruction. (*Woods*, *supra*, 241 Cal.App.4th at pp. 479–480.) The appellate court rejected this assertion on the ground the One Strike sentencing allegations were akin to enhancement allegations, which courts are not to look at for purposes of determining whether an accusatory pleading embraces a lesser included offense. (*Id.* at pp. 480–482, citing to *People v. Wolcott* (1983) 34 Cal.3d 92, 96, 100–101.) The court observed: "In this case, the One Strike allegations against Woods operated in the same way that the enhancement allegation operated in *Wolcott*, as a review of the verdict forms confirms. The verdict forms demonstrate that the jury first determined Woods's guilt on the substantive offense of forcible rape, which did not involve any determination as to the victim's age. Only after the jury determined that Woods was guilty as to each count of forcible rape did the jury then answer the separate question whether it found 'that in the commission of the above offense the victim was a minor over fourteen years of age or older and that said defendant has been convicted in the present case of committing a separate violation of PC 261(a)(2), 288a(c)(2)(A), or PC 288a(d)(1) against the same victim . . . on a separate occasion, within the meaning of PC 667.61(m).' Thus, the jury did not consider the evidence as to

25

the One Strike allegation in determining Woods's guilt as to the forcible rape charge; as in *Wolcott,* the 'orderly, step-by-step procedure' would have 'become muddled' if the jury had been required to consider evidence of the One Strike law allegation 'in determining guilt of a lesser offense.' (*Wolcott,* . . . at p. 101.)." (*Woods,* at p. 482, italics omitted.)

Freeman's claim here, that he was entitled to a lesser included instruction on unlawful intercourse with a minor, fails for the reasons articulated in *Woods.* Although the allegations of the forcible rape counts refer to the "crime of Forcible Rape-Child Victim Over 14 years" and include the birthdates of each victim, there are no allegations as to Freeman's age. Thus, the forcible rape allegations do not describe any of the three ways in which the offense of unlawful intercourse with a minor can be committed.

Freeman asserts *his own age*[10] is immaterial and the pivotal allegations were that the offenses were against "child victims" over 14 years, along with their respective birthdates. But, this assertion is predicated on the claim that *subdivision (a)* of section 261.5, itself, criminalizes any intercourse with a person under the age of 18, and subdivisions (b) through (d) prescribe only the "severity" of the offense. *Woods,* however, concludes otherwise, and to our knowledge, no appellate court has disagreed with its reasoning.

The trial court, accordingly, did not err in refusing to instruct the jury on unlawful intercourse with a minor as a lesser included offense of forcible rape.

In any event, on this record, any error would be harmless. We review the failure to instruct on a lesser included offense for prejudice under the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v.*

_____

[10] He also notes the prosecution presented evidence that he was born on October 9, 1990.

*Breverman* (1998) 19 Cal.4th 142, 178 (*Breverman*), disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 256–257.) Thus, reversal is required only if, after " 'an examination of the entire cause, including the evidence' . . . it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*Breverman*, at p. 149.) A " 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) In other words, the probability is sufficient to undermine confidence in the outcome. (*Ibid.*) Thus, appellate review under *Watson* focuses not on what a reasonable jury could do, but what such jury is likely to have done in the absence of the error. (*Breverman, supra,* 19 Cal.4th at p. 177.)

Freeman argues the error was prejudicial because "the jury was presented with an all or nothing choice." He asserts "there was evidence from which reasonable jurors could have concluded" he "committed the lesser rather than the greater offense" had they been given a choice. We disagree.

Contrary to Freeman's assertion, there was insufficient evidence that Freeman only committed statutory rape but did not forcibly rape his victims. There was ample evidence of force, including: J (count 1) testified that she told Freeman "to stop" and when he did not stop, she unsuccessfully "tried to push him off" of her. J further stated that Freeman removed her underwear and sexually assaulted her. During the assault, J "was telling him to stop, but he told [her] that [she] wanted it." J testified that she did not "want it" and that the assault only stopped because a lady had walked past them. It was only then that J was able to "push him" off. J explained that she did not run away because Freeman was "kind of scary" and "bigger" than she was. About a year later, J told a counselor about what had happened to her. When

27

J's counselor called the police, J was "mad at first" because she was "scared of the defendant."

M (counts 3, 7-10, 14-15) recounted numerous instances of force, including that Freeman had pulled her by her clothing into the backseat of his car, zipped-tied her hands, and warned her not to fight back. M also tried to keep her legs closed, but Freeman pushed them open with his hands. Several months after the incident, Freeman apologized to M, saying what happened was "messed up." As part of his apology Freeman said, " 'let me make it up to you.' "

M also described the harrowing experience of being blindfolded and driven to an apartment in San Francisco, where Freeman raped her. M said no, tried to push him off, and screamed to no avail. When M told Freeman that he had " 'just raped' " her, he responded by saying, " 'Don't say that.' "

M also testified about another incident where Freeman "started to undress" her and she "tried the hardest [she] could to keep [her] legs together." Although she "was able to keep [her] legs together," Freeman "lifted her legs up and was still able to penetrate" her.

M told her therapist and a child protective services investigator that Freeman had repeatedly raped her. Eventually, she shared the details of the sexual assaults with an investigating officer.

P (count 15) testified about how Freeman raped her in the back seat of a car. P explained that Freeman offered her marijuana that appeared to be laced with something because she started feeling dizzy, disoriented and sleepy. She did not recall much other than that her hands were tied behind her with the seat belt and that her head was hitting the door as he penetrated her vagina with his penis.

T (counts 18 & 19) described an incident in a car, where Freeman became "frisky" and started removing her clothes. When T told Freeman, " 'No,' " he picked her up from where she had been sitting in the front seat and "threw" her into the back seat. T tried to "push" Freeman's face away as he repeatedly tried to kiss her. Freeman grabbed T's wrists and put them above her head, removed T's clothes and raped her.

D (count 19) testified about how Freeman prevented her from leaving a bedroom by blocking the door with his body. When D said she wanted to leave, Freeman "grabbed" her forearm with a "tight" hold and then "forceful[ly]" "pushed" her onto a bed. D "wanted to leave" but she was "very drunk" and "scared" of Freeman. She asked him to stop but he did not listen. Instead, he pulled off D's pants and raped her. At one point during the assault, Freeman had his "hand around [D's] throat," which left a bruise. D did not consent to having sex with Freeman. A few days after the rape, Freeman texted D that he felt bad about the way he treated her and wanted to make it up to her.

In light of the plethora of evidence demonstrating that Freeman used "force, violence, duress, menace, or fear" (§ 261, subd. (a)(2)) to have sexual intercourse with his victims, there is no reasonable probability that the jury would have convicted him of statutory rape if given the choice.

3. *Failure to Instruct on Lesser Included Offense of Non-Forcible Oral Copulation of a Minor as to Charges of Forcible Oral Copulation of a Minor (Counts 6, 11, 12, 13—Victim M and Count 20—Victim D)*

Freeman contends the court prejudicially erred in failing to instruct the jury on the lesser included offense of nonforcible oral copulation of a minor

29

(§ 287, subd. (b)(1), former § 288a, subd. (b)(1))[11] to the charged counts of forcible oral copulation of a minor (§ 287, subd. (c)(2)(C), former § 288a, subd. (c)(2)(C))—counts 6, 11, 12, 13, involving M and count 20 involving D.

The People concede that nonforcible oral copulation of a minor under the age of 14 is a lesser included offense of forcible oral copulation but argue the failure to instruct on the lesser included offenses was harmless.

Even assuming without deciding there was instructional error, we see no prejudice. As noted above, when a trial court fails to instruct on a lesser included offense, reversal is not required unless there is a reasonable probability that the defendant would have obtained a more favorable outcome had the instruction been given. (*Breverman*, *supra*, 19 Cal.4th at p. 178.)

As we have described, M unequivocally testified that she neither consented to nor willingly engaged in *any* sexual act. When she met Freeman, M was a 13-year-old girl, with a difficult home life, who "just wanted somebody to care" about her. At times she lived in a car. During their first meeting, despite her repeated efforts to stop him, either saying "no" or moving away from him, Freeman forcibly touched her and then raped her. Freeman zip-tied her hands and warned her to never "fucking hit" him; M was scared and stopped trying to fight off the much older and bigger Freeman. During subsequent encounters, Freeman plied M with drugs and alcohol. While in a "buzzed" state, Freeman pulled her by the hood of her jacket into the back seat of his car and forced her to perform oral sex on him by "pushing" her "head down" with his hands. To no avail, M "[t]ried pushing him off" of her and kept saying " 'No' " and " 'I don't want to do this.' "

---

[11] As noted, former section 288a is now section 287.

On another occasion, Freeman had taken M out and then refused to take her home if she did not perform oral sex. M said she tried to do it "really bad" by using her teeth so that he would take her home. M testified she was afraid of Freeman, adding that he "verbally and physically" forced her to have oral sex. Another time, Freeman gave M "some white powder substance" and told her it was cocaine. However, unlike cocaine, the substance made her feel extremely tired; M described "fighting to . . . stay awake" and "keep [her] eyes open." While she was in that state, Freeman forced her to have oral sex with him by putting his penis in her mouth.

On a different occasion, Freeman blindfolded M and drove her to an apartment in San Francisco; M described feeling "frozen, . . . kind of paralyzed," and "really, really scared." After taking her to an upstairs bedroom, Freeman raped her; he refused to take M home unless she performed oral sex on him, which she did.

It was much the same with victim D. She testified Freeman lured her into a bedroom with the promise of drugs. Freeman then blocked the bedroom door with his body so that D could not leave. When D tried to leave, Freeman tightly grabbed her arm. D told Freeman she wanted to leave, but he forcefully pushed her onto the bed. D was "very drunk" and could not get up. As she was laying on her back on the bed, D again told Freeman she wanted to leave. Freeman took off D's pants and told her to get on her knees. D did not want to get on her knees but she did so because she was intoxicated and afraid. Freeman then started to perform oral sex on D, "licking [her] genitals." D asked Freeman to stop but he did not listen; D testified she did not want him to perform oral sex on her. At one point, Freeman had his hand around D's neck. Freeman later put his penis in D's vagina. After the

assault, D wanted to leave but Freeman restrained her on the bed for about five minutes.

In light of the overwhelming evidence (as we have described) that Freeman committed the charged offenses against M and D by force and/or duress and no evidence supporting a contrary conclusion, it is not reasonably probable Freeman would have obtained a more favorable outcome even if the jury had been instructed with the lesser offense. (See *People v. Rogers* (2006) 39 Cal.4th 826, 867–868.)

## C.    *Failure to Give Unanimity Instruction (Count 4)*

Freeman was convicted of one count of forcible lewd and lascivious acts (§ 288, subd. (b)(1), count 4)) on victim M, who was under the age of 14 years old. Freeman maintains "there were several possible acts" which could have formed the basis of this count of conviction (count 4), and in the absence of an election by the prosecution as to the "[s]pecific [t]ouching," the court on its own should have delivered a unanimity instruction. He claims the failure to give a unanimity instruction was reversible error. We disagree.

### 1.    *Additional Background*

During closing argument the prosecutor outlined the charges and described counts 2 through 4 as when defendant "met" victim M; "he took her to Higgins Canyon, and he raped her in his car." The prosecutor argued as follows:

"[H]e tried to convince [M] to get into the back seat of that car. She didn't want to. He began touching her. [¶] . . . [¶] That didn't deter him. He physically moved her into the back seat of that car, and he continued to touch her. . . . [¶] . . . He raped her. . . . [¶] For that incident, the defendant is charged with three counts: Forcible rape, 261; 288 which is lewd touching of a minor with force; and a 207(b), which is a kidnap with an indent [*sic*] to

32

commit a child molest." (This was a description of counts 2, 3, and 4.)  In describing lewd and lascivious conduct, the prosecutor argued, "[i]t just requires that he touched any part of a child's body.  It doesn't have to be her breast.  It doesn't have to be her vagina. . . . Lewd and lascivious conduct can happen from touching a shoulder or a wrist if there is also force, violence, duress, menace, or fear used.  [¶] The force is a little bit different than in rape, and we'll get to that.  And when that touching [of] any part of the body, the face, when that happens, the intent is to arouse, sexually appeal, gratify lust, passions, or for sexual desire.  Here there's no question.  Why was the defendant touching her?  Because he had a sexual desire.  [¶] . . . [¶] . . . What we're talking about here is when he was touching her, and she was pulling away.  She was moving her body away.  *He continued to touch her. . . . And as she's trying to resist him, he's continuing to touch her.  That is lewd and lascivious conduct with force*.  [¶] How do we know also why—what his intent was?  Well, because he then raped her." (Italics added.)

2.    *The Trial Court Did Not Err By Failing to Give a Unanimity Instruction*

"In a criminal case, a jury verdict must be unanimous.  [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime.  [Citation.]  Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.  [Citations.]

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] . . . 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has

33

been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.'" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132; see *People v. McDaniel* (2021) 12 Cal.5th 97, 145.)

As a general rule, "[w]hen the evidence tends to show a larger number of distinct violations of the charged crime than have been charged and the prosecution has not elected a specific criminal act or event upon which it will rely for each allegation, the court must instruct the jury on the need for unanimous agreement on the distinct criminal act or event supporting each charge." (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1309 (*Avina*).) But "'[n]either instruction nor election are required . . . if the case falls within the continuous course of conduct exception,'" either because the acts are so closely connected as to be part of the same transaction or if the statute contemplates a continuous course of conduct of a series of acts over a period of time.[12] (*Ibid.*)

We pause to note that the evaluation for issuing a unanimity instruction is distinct from the test for staying convictions under section 654, which we shall discuss in more detail *post*. A course of criminal conduct is divisible so as to allow multiple punishment, if the defendant had a separate intent and objective for each offense. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208–1209.) In contrast, a court is required to give a unanimity instruction if the jury might improperly render a guilty verdict without unanimous agreement on the offense that supports the verdict, subject to the

---

[12] "'This second category of the continuous course of conduct exception has been applied to a limited number of varying crimes, including pimping [citation], pandering [citation], failure to provide for a minor child [citation], contributing to the delinquency of a minor [citation], and child abuse.'" (*Avina, supra*, 14 Cal.App.4th at p. 1309.)

continuous course of conduct exception discussed *ante*. (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.)

Here, the evidence shows an especially close temporal connection between the lewd touchings that occurred in Freeman's car; thus we are concerned with only the first aspect of the continuous course of conduct exception—i.e. when " 'the acts are so closely connected that they form part of one and the same transaction, and thus one offense.' " (*Avina, supra*, 14 Cal.App.4th at p. 1309.)

Freeman's opening brief focuses entirely on what he claims are discrete acts requiring a unanimity instruction.[13]  Count 4 alleged the commission of a forcible lewd act on a child under the age of 14 years based on the initial incident between Freeman and M in his car.  The evidence demonstrates that Freeman began trying to touch and kiss M while she was in the front seat.  M said, " 'No' " and tried to move away from him.  Freeman tried to convince her to move to the back seat; when she indicated she "didn't want to," he "grabbed the hood of [her] jacket and pulled [her] into the back."  While in the back seat, Freeman was "trying to undress" M.  As he was undressing her, M "was still saying no and . . . trying to . . . keep his hands off" her, "but it wasn't working."  M was "trying to move away from where his hands were," but that did not deter him.  M's "top stayed on, but [her] pants—everything

_____

[13] For the first time in his reply brief, Freeman, citing *People v. Brown* (1996) 42 Cal.App.4th 1493, 1501, footnote 6, asserts the continuous course of conduct exception does not apply to lewd and lascivious acts.  "We need not, and typically do not, address arguments raised for the first time in a reply brief." (*People v. Wilson* (2023) 14 Cal.5th 839, 872, fn. 11.)  In any event, *Brown* is distinguishable.  There, the court rejected the People's argument that molestations that occurred on two different days constituted a continuing course of conduct. (*Brown*, at p. 1501, fn. 6.)  Here, the lewd acts occurred within a short period of time in Freeman's car.

from the waist down came off." M "was trying to protect [herself] and cover [herself] up and close [her] legs," but "it didn't work." M was not "strong enough" to keep Freeman from opening her legs with his hands. M tried to "push and hit" Freeman, "trying to fight him." Freeman told M, " 'Don't ever fucking hit me.' "

The evidence demonstrates that Freeman's lewd and lascivious acts by force against her were so closely connected and happened over such a short period of time that they were part of one continuous course of conduct. M testified that Freeman continuously tried to touch her in the car. Thus, there was no danger that different jurors would find Freeman guilty of different lewd acts in the car during those minutes on that date. " '[W]here the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place, the instruction is not necessary to the jury's understanding of the case.' " (*People v. Beardslee* (1991) 53 Cal.3d 68, 93.)

Even were we to assume a unanimity instruction was required, on this record, any error would be harmless beyond a reasonable doubt. (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 186–188 (*Wolfe*).) Error in failing to give a unanimity instruction is harmless beyond a reasonable doubt "where the defendant offered the same defense to all criminal acts, and 'the jury's verdict implies that it did not believe the only defense offered.' " (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 577.)

In this case, the jury was presented with evidence that Freeman committed forcible lewd acts against M during a short period of time in the car. Freeman did not deny touching M in the car. Rather, his defense to count 4, as we have discussed, was to challenge the sufficiency of the evidence that she was under the age of 14 at the time it was committed. During

closing argument, defense counsel argued: "Our defense to that charge doesn't depend upon consent[14] . . . We agree that there was sexual contact. Our defense is that [the prosecution's] evidence as to her age is nowhere near proof beyond a reasonable doubt . . . ." Irrespective of the legality of such a defense, the jury clearly found M to be credible and rejected Freeman's version of the events.

Freeman further contends that had the prosecution elected a specific act, he "would have had separate defenses" to count 4. He complains that because the "prosecution argued multiple possible touchings including some (shoulder and face) for which there was no evidence whatsoever, and others (wrist) that reasonable jurors could have disagreed about whether the touching was a lewd act." Freeman takes the prosecutor's statements out of context. The prosecutor was merely using examples to explain that lewd acts did not need to be overtly sexual, so long as the "intent is to arouse, sexually appeal, gratify lust, passions, or for sexual desire."

Freeman further claims that although "[t]he evidence established touches to M's clothing," "the evidence did not establish touches of the body through the clothing as required for violations of section 288." The record belies this claim; M clearly testified that Freeman removed all of her clothing from the waist down and continually reached between her legs, forcing them open. M said she unsuccessfully "tr[ied] . . . to . . . keep his hands off [her]." This evidence demonstrates that Freeman touched M's body directly and through her clothes. No reasonable jurors could have disagreed about whether this conduct constituted lewd acts. Any error in failing to provide a unanimity instruction was harmless in light of the overwhelming evidence of

---

14 Despite defense counsel's argument, the gravamen of Freeman's testimony was that he engaged in consensual sex with each victim.

the lewd and lascivious acts. (See *Wolfe, supra,* 114 Cal.App.4th at pp. 187–188.)

## III.

## Sentencing

A. ***Failure to Apply Section 654 as to Rape (Count 3) and Lewd Acts (Count 4)***

Relying on section 654, Freeman contends he could not be punished for both the forcible rape of M (count 3) and the commission of a forcible, lewd act on M (count 4). We disagree.

1. *Additional Background*

The court imposed consecutive sentences for counts 3 and 4 as follows: an indeterminate sentence of 15 years to life on count 3 (§ 261, subd. (a)(2) [forcible rape of child under the age of 14 years]) and an indeterminate sentence of 25 years to life on count 4 (§ 288, subd. (b)(1) [forcible lewd act on a child under the age of 14 years]).

In imposing this sentence, the court expressly determined that section 654 did not preclude separate punishment: "As for Counts 3 and 4, the Court finds separate occasions . . . . [¶] Here, the facts relevant to the Court, defendant pulled [M] by her hoodie into the back seat, proceeded to touch her over her clothing, attempted to kiss her. [M] resisted the defendant, [who] stated, quote, 'don't fucking touch me,' . . . [defendant] zip-tied her hands and then raped her. [¶] There was an interval in between the sexual acts that afforded the defendant a reasonable opportunity for reflection. Accordingly, the Court finds separate occasions for Counts 3 and 4."

2. *Applicable Law*

Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be

38

punished under more than one provision." (§ 654, subd. (a).) "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).)

At the first step of the inquiry, we "consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act," and our analysis ends there. (*Corpening*, *supra*, 2 Cal.5th at p. 311.) However, if we conclude the crimes in question involve more than a single act, i.e., a course of conduct, we turn to the second step of the inquiry. (*Ibid.*)

At step two, we determine whether the course of conduct constitutes an indivisible transaction. (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006 (*Alvarez*).) Generally, "whether a course of conduct is a divisible transaction depends on the intent and objective of the actor: 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Ibid.*; see *Corpening*, *supra*, 2 Cal.5th at p. 311 [step two concerns whether the course of conduct reflects a single intent and objective or multiple intents and objectives].)

However, in sex offense cases, courts have consistently applied an exception to the general rule that a single course of conduct precludes multiple punishment. (See *Alvarez*, *supra*, 178 Cal.App.4th at p. 1006 [noting "the rule is different in sex crimes"].) In such cases, [e]ven where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished." (*Ibid.*; see, e.g., *People v. Siko* (1988) 45

Cal.3d 820, 826 [separate punishment for lewd conduct impermissible where it was the very basis for rape and sodomy convictions].)

Additionally, " ' "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment" ' " without violating section 654. (*People v. Clair* (2011) 197 Cal.App.4th 949, 960 (*Clair*).) " 'This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' " (*Ibid.*)

Whether acts constitute an indivisible course of conduct for purposes of section 654 is a question of fact for the trial court. (*Clair, supra*, 197 Cal.App.4th at p. 959.) We will uphold a court's implied finding that section 654 does not apply if it is supported by substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.) We review that determination in the light most favorable to it and presume the existence of every fact that could reasonably be deduced from the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

With these principles in mind, we apply the two-step inquiry described above to counts 3 and 4.

3. *Analysis*

Freeman complains that there "was insufficient evidence to prove a lewd act as charged in Count [4] independent of the sexual intercourse forming the basis for the rape charged in Count [3]." According to Freeman, section 654 bars punishment for both forcibly raping M and forcibly committing lewd acts on her. He claims he committed no "specific lewd

touching separate from intercourse," and that all touching was "preparatory to the act of intercourse." We are not convinced.

We begin at the first step of the section 654 analysis and conclude counts 3 and 4 involved a course of conduct rather than a single act. (See *Corpening, supra*, 2 Cal.5th at p. 311.) The trial court found these counts were based on the facts that Freeman "pulled [M] by her hoodie into the back seat, proceeded to touch her over her clothing, attempted to kiss her." When M resisted Freeman, he "zip-tied her hands and then raped her." This finding is amply supported by the trial evidence given M's testimony that Freeman attempted to kiss and touch her in the front seat. When M tried to resist Freeman, he pulled M into the back seat, where he continued to touch her and removed her clothing. Freeman touched M "[i]n between [her] legs." M testified that she tried to close her legs and protect herself, but Freeman overcame her efforts and pushed her legs open with his hands. Freeman then zip-tied her hands. M testified that when she managed to physically fight back, Freeman said, " 'Don't ever fucking hit me.' " M became scared and stopped trying to fight back. Freeman then raped her. We therefore proceed to the second step of the inquiry. (See *ibid*.)

Presuming every fact that could reasonably be deduced from the evidence (*People v. Jones, supra*, 103 Cal.App.4th at p. 1143), substantial evidence supports the court's finding that the course of conduct underlying counts 3 and 4 constituted divisible transactions for purposes of step two of the section 654 analysis. One can reasonably deduce from the evidence that after the lewd and lascivious touching of M both in the front and back seat of the car, Freeman had a reasonable opportunity to reflect on M's resistance, including taking the time to zip-tie her hands, before he raped her. (*People v. Pena* (1992) 7 Cal.App.4th 1294, 1314–1315 [reversal unwarranted unless "no

41

reasonable trier of fact" could decide there was "reasonable opportunity for reflection"].) This remains true even though, as Freeman points out, his conduct was directed to a single intent and objective (i.e., sexual gratification). (See *ibid.*; see also *Alvarez, supra,* 178 Cal.App.4th at p. 1006 [section 654 does not necessarily apply in sex crime cases even where a defendant has the sole objective of sexual gratification].)

Accordingly, the trial court did not err in finding the sentences were based on a course of conduct with divisible transactions for purposes of section 654.

## B. *Failure to Award Custody and Conduct Credits*

Freeman contends the trial court erred in failing to award both presentence custody and presentence conduct credits. The People concede that Freeman is entitled to presentence custody credits, but argue that he is not entitled to any conduct credit because he was sentenced under the One Strike law, section 667.61.

### 1. *Additional Background*

The One Strike law imposes aggravated punishment on persons convicted of specified sexual offenses under special circumstances that have been pled and proved. (See § 667.61; *People v. Jones* (1997) 58 Cal.App.4th 693, 708–709.) The statute applies to various sex crimes, as relevant here: rape (§ 261, subd. (a)(2) or (6)), lewd act on a child (§ 288, subd. (a) or (b)), and oral copulation (§ 288a, subd. (c)(2); 667.61, subds. (c), (e)).

As noted, Freeman was convicted of 20 felony offenses, of which 17 were specified sexual offenses subject to the One Strike law. Those qualifying offenses are: 11 counts of rape (§§ 261, subd. (a)(2), 667.61, subd. (c)(1), counts 1, 3, 7, 8, 9, 10, 14, 15, 17, 18 and 19), one count of committing a lewd act on a child (§§ 288, subd. (b), 667.61, subd. (c)(4), count 4) and five

42

counts of oral copulation (§§ 288a, subd. (c)(2), counts 6, 11, 12, 13, and 20, 667.61, subd. (c)(7)).

The court sentenced Freeman to six terms of life without the possibility of parole (counts 6, 7, 8, 9, 10, and 15), one parole eligible life sentence (§ 209, subd. (b)(1) [kidnapping to commit another crime] count 5) stayed pursuant to section 654, consecutive to an indeterminate term of 245 years to life. (The indeterminate term was comprised of 15 years to life on counts 3, 17, 18 and 25 years to life on counts 1, 4, 11, 12, 13, 14, 19, and 20.) The court did not award any credits—neither custody nor conduct credits.

As to his entitlement to conduct credits, Freeman's briefing is less than clear. In his opening brief, he states in two sentences, without more, that when a defendant is convicted of violent crimes within the meaning of section 667.5, his presentence conduct credits are limited by section 2933.1, subdivision (c), to 15 percent " 'of the maximum otherwise permitted.' " And that awarding conduct credits under section 2933.1 is not a discretionary matter. There is no more explanation or discussion than that.

In opposition, the People respond that Freeman "overlooks his ineligibility for conduct credits under section 667.61," i.e., the One Strike law that applies to "defendants such as appellant, given indeterminate terms" under that section. The People cite to *People v. Adams* (2018) 28 Cal.App.5th 170, 182 (*Adams*), a case directly on point. In *Adams*, the court held that presentence conduct credit is not available for One Strike offenders. (*Id.* at p. 181.)

Freeman did not even mention the existence of section 667.61 and *Adams* (let alone the cases that follow it) until his reply brief. In reply he "acknowledges" that *Adams* and the cases cited by the People that follow it hold that "no conduct credits are available to any offender sentenced under

43

the 'One Strike" law," but contends that the "legislative analysis upon which this conclusion is based does not support the broad conclusion that *all* 'One Strike' " offenders are precluded from earning conduct credits. Freeman argues the subsequent legislative history "demonstrates that the Legislature intended to render *some*, but not all, specific defendants"—recidivist offenders or those convicted of a sex offense during the commission of another offense—"sentenced under the One Strike Law ineligible for conduct credits."

As best we can discern from his reply brief, Freeman argues that although in "theory" he would be ineligible for conduct credits, he is in fact not disqualified from receiving conduct credits based on his interpretation of portions of the legislative history, none of which he even alluded to in his opening brief. He appears to argue that "as discussed in Argument II" of his opening brief, the evidence was "insufficient" to sustain the aggravated kidnapping circumstances associated with his rape convictions, and therefore the One Strike law does not apply to him.

As we have noted, reviewing courts generally do not consider issues raised for the first time in reply briefs. (*People v. Wilson, supra*, 14 Cal.5th at p. 872, fn. 11.) On this basis alone we could reject his argument about conduct credits. But even overlooking this obvious forfeiture, Freeman's argument fails on the merits.

2. *Analysis*

In *Adams*, the issue was whether the defendants were entitled to presentence conduct credits at a discounted rate under section 2933.1, subdivision (c) or statutorily ineligible altogether due to changes in the One Strike sentencing law. (*Adams, supra*, 28 Cal.App.5th at p. 181.) *Adams* began: "Because they were convicted of violent felonies as defined in section 667.5, subdivision (c), the trial court limited defendants' presentence conduct

44

credit to 15 percent under section 2933.1, subdivision (c). We asked the parties to brief the question whether the 2006 amendment to section 667.61, subdivision (j), eliminated defendants' eligibility for conduct credit. (Stats. 2006, ch. 337, § 33, pp. 2639, 2641.) We hold as a matter of statutory interpretation that it did." (*Adams*, at p. 181.)

We find the analysis in *Adams* persuasive. The *Adams* court reasoned: "Section 667.61 was amended in 2006 . . . to eliminate the existing section 667.61, subdivision (j) and any reference to presentence conduct credits. (Stats. 2006, ch. 337, § 33, pp. 2639, 2641.) It is uncertain on its face whether the amendment was intended to eliminate presentence conduct credit for defendants sentenced under section 667.61, or to authorize full conduct credit under section 4019. We turn, therefore, to the legislative history. Committee reports evidence the Legislature's intent to eliminate conduct credit for defendants sentenced under section 667.61, the so-called 'One-Strike Law.' The Senate Committee on Public Safety's analysis of Senate Bill No. 1128 (2005-2006 Reg. Sess.) unambiguously states: 'Elimination of Sentencing Credits for One-Strike Inmates [¶] Existing law provides that a defendant sentenced to a term of imprisonment of either 15 years to life or 25 years to life under the provisions of the "one-strike" sentencing scheme shall not have his or her sentence reduced by more than 15% by good-time/work-time credits. [Citation.] [¶] This bill eliminates conduct/work credits for inmates sentenced under the one-strike law.' (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1128 (2005-2006 Reg. Sess.) as amended Mar. 7, 2006, p. N, underscoring omitted; accord, *id.* at p. W ['This bill eliminates sentencing credits that under existing law can reduce a defendant's minimum term by up to 15%' (underscoring omitted)]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1128 (2005–2006 Reg. Sess.) as

45

amended May 26, 2006, pp. 8-9 [Sen. Bill No. 1128 eliminates eligibility 'for credit to reduce the minimum term imposed']; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1128 (2005-2006 Reg. Sess.) as amended May 30, 2006, p. 9 [same].)" (*Adams*, *supra*, 28 Cal.App.5th at p. 182; accord *People v. Govan* (2023) 91 Cal.App.5th 1015, 1036–1037; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 267–268.)

In his reply brief, Freeman acknowledges *Adams*, *Govan*, and *Dearborne*, but suggests he is not precluded from earning conduct credits based on his interpretation of the legislative history, unsupported by any case authority. His claim, however, is contingent on the merits of his insufficiency of the evidence claim regarding the kidnapping allegations—a claim we have already found to be without merit. (See section I. Sufficiency of the Evidence, par. B, *ante* at p. 15.) As discussed, substantial evidence supports Freeman's disqualifying offenses—i.e., he committed numerous enumerated sexual offenses (counts 6-10), while engaged in kidnapping (§ 667.61, subd. (d)(2)).

Accordingly, we conclude that given his indeterminate term under section 667.61, Freeman is not entitled to any presentence conduct credit. (*Adams*, *supra*, 28 Cal.App.5th at pp. 181–182.)

However, as the People concede, Freeman is entitled to presentence custody credits. (See § 2900.5, subd. (a); *People v. Ravaux* (2006) 142 Cal.App.4th 914, 919.) As there appears to be a factual discrepancy regarding the date of Freeman's arrest, we remand this issue to the trial court for a determination of the appropriate amount of presentence custody credits. (See *People v. Fares* (1993) 16 Cal.App.4th 954, 958.)

## DISPOSITION

The matter is remanded to the trial court for the limited purpose of calculating and awarding presentence custody credits. (§ 2900.5, subd. (b).)

Upon the calculation and award of the presentence custody credits, the clerk of the superior court is directed to prepare an amended sentencing minute order. The clerk of the superior court is further directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.

_____
Miller, J.

WE CONCUR:

_____
Stewart, P. J.

_____
Desautels, J.

A169624, *People v. Freeman*

47